

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| CELINA WHINERY, | No. CV 10-9312 PA (AGRx) |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, and CITIGROUP LIFE INSURANCE BENEFIT PLAN, | |
| Defendants. | |

This is an Employee Retirement Income Security Act ("ERISA") action for recovery of accidental death benefits. Plaintiff Celina Whinery ("Plaintiff") seeks benefits under a group insurance policy issued to Citigroup, N.A. by Life Insurance Company of North America ("LINA"). Plaintiff's husband, Timothy Whinery, was an insured under the policy. Mr. Whinery died on December 16, 2007, after the automobile he was driving crashed into a tree. Plaintiff made a claim for accidental death benefits under the policy. After LINA denied her claim, Plaintiff commenced this action on December 3, 2010.

After providing Plaintiff with an opportunity to conduct discovery concerning LINA's potential conflict of interest. LINA filed the Administrative Record (Docket Nos. 35 & 36) and Plaintiff's counsel submitted additional materials obtained through discovery

1    (Docket Nos. 38, 44, & 52).  Then, on December 20, 2011, the Court, sitting without a jury,

2    conducted a bench trial.  However, rather than issue Findings of Fact and Conclusions of

3    Law at that time, the Court remanded Plaintiff's claim to LINA so that it could apply the

4    definition of "accident" adopted by the Ninth Circuit in Padfield v. AIG Life Ins. Co., 290 F.

5    3d 1121, 1126 (9th Cir. 2002).

6        On remand, LINA again denied Plaintiff's claim.  Plaintiff appealed LINA's denial

7    through LINA's internal appeals procedure and LINA upheld its denial.  At the Court's

8    direction, following Plaintiff's exhaustion of her administrative remedies, the parties

9    submitted a Joint Status Report to the Court on July 3, 2012.  The Court then issued a

10   Scheduling Order that required the filing of a Supplemental Administrative Record, allowed

11   the parties to submit trial briefs, and set the matter for a Court trial on November 6, 2012.

12       The Administrative Record (pages 1-117) and Supplemental Administrative Record

13   (pages 118-1100) are numbered sequentially.  The Court will therefore cite collectively to

14   the Administrative Record and Supplemental Administrative Record as "AR __."

15       After LINA submitted the Supplemental Administrative Record (Docket No. 65),

16   Plaintiff filed a Motion to Augment the Supplemental Administrative Record (Docket No.

17   74).  In its Motion to Augment, Plaintiff asserted that LINA had not included in the

18   Supplemental Administrative Record communications between LINA's legal department

19   and outside counsel and those handling Plaintiff's claim on remand and appeal.  Relying on

20   Stephan v. Unum Life Ins. Co., No. 10-16840, 2012 WL 3983767 (9th Cir. Sept. 12, 2012),

21   Plaintiff asserted that communications between LINA's in-house and outside counsel and

22   those handling her claim from the date of the first trial on December 20, 2011, through July

23   3, 2012, when the parties submitted their Joint Status Report following rejection of

24   Plaintiff's final appeal, were subject to the fiduciary exception to the attorney-client

25   privilege and were both discoverable and relevant to the amount of deference this Court

26   should apply.

27       To assess the merit of Plaintiff's assertions, the Court ordered LINA to file what it

28   considers to be communications subject to the attorney-client privilege under seal and in

1  camera without providing a copy to Plaintiff.  LINA submitted these "privileged" documents

2  to the Court on October 25, 2012 (Docket No. 102).[1/]  The Court has reviewed the

3  documents and concludes that they should not be provided to Plaintiff or made part of the

4  Administrative Record.  First, as the Ninth Circuit indicated in <u>Stephan</u>, "[t]here is no

5  binding precedent in this circuit delineating precisely when the interests of a Plan fiduciary

6  and its beneficiary become sufficiently adverse that the fiduciary exception no longer

7  applies."  <u>Stephan</u>, 2012 WL 3983767, at *13.  Because Plaintiff had already commenced

8  litigation and this action was technically still pending during the remand, the Court

9  concludes that the fiduciary exception does not apply.  Second, <u>Stephan</u> was not decided

10  until LINA had already issued its decision denying Plaintiff's appeal and the matter was

11  back on this Court's active calendar, so LINA had little notice that the communications

12  between its lawyers and those handling the claim might be discoverable.  Finally, as will be

13  discussed in more detail below, nothing contained in those documents alters the ultimate

14  determination the Court reaches.

15        Having considered the materials submitted by the parties and after reviewing the

16  evidence, the Court makes the following findings of fact and conclusions of law pursuant to

17  Federal Rule of Civil Procedure 52(a).  Any finding of fact that constitutes a conclusion of

18  law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a

19  finding of fact is hereby adopted as a finding of fact.

20  **I.    <u>Findings of Fact</u>**

21  1.    Citigroup, N.A. ("Citigroup") established an employee welfare benefit plan (the

22  "Plan") for the benefit of its employees which paid benefits in the event of a covered

23  employee's accidental injury or death.  (AR 91-117).

24  2.    The Plan was funded through the purchase of a group accident insurance policy (the

25  "Policy") by Citigroup from LINA.  The Policy number was OK 815669, effective January

26  _____

27  [1/]        These documents are numbered with a "PRIV" prefix before the page number.  To
28  the extent the Court cites to these documents in the remainder of these Findings of Fact and
Conclusions of Law, the Court will adopt this numbering scheme.

1, 2001, and was in effect at all relevant times during the events described below.  (AR 91-117).

3.      The Policy provides: "We agree to pay benefits for loss from bodily injuries: (a) caused by an accident which happens while an insured is covered by this policy; and (b) which, directly and from no other causes, result in a covered loss."  (AR 91).

4.      The Policy does not define the term "accident."  (AR 91-117)

5.      The Policy does not contain an exclusion for deaths resulting from intoxication or the use of controlled substances.  (AR 91-117).

6.      The Policy grants LINA "the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact."  (AR 94).

7.      In December of 2007, Timothy Whinery was a 41-year-old resident of Thousand Oaks, California who was a project manager with Smith Barney, a subsidiary of Citigroup. (AR 70-71).

8.      As a result, he was covered by the Plan and Policy and entitled to benefits under the Plan and Policy in the event of a covered loss.  (AR 82).

9.      Mr. Whinery was insured for $418,000 under the Policy.  (AR 82).

10.     Mr. Whinery's job was very stressful and he had a history of cardiac problems.  (AR 71).  On his physician's recommendation, Mr. Whinery had taken a medical leave of absence from his job in October 2007.  (AR 71).  Plaintiff informed investigators that Mr. Whinery was taking several medications, including Plavix, Seroquel, Zoloft, Klonopin, Vytorin, Trazadone, Singulair, and Lamictal.  (AR 71).

11.     According to his Plaintiff, Mr. Whinery had been sober for over a year and was doing well.  (AR 71).  He was planning on taking his family on a snowboarding trip to Mammoth Mountain at Christmas.  (AR 79).

12.     On December 16, 2007, Mr. Whinery had an argument with his wife.  He left his house at approximately 2:00 p.m.  (AR 71).

13.     At approximately 10:45 p.m., Mr. Whinery was traveling westbound on Pederson Road in Thousand Oaks, California.  (AR 70).

14.     The posted speed limit was 45 miles per hour.  (AR 43).

15.     The weather was clear and conditions were dry.  (AR 34).

16.     Police records show that Mr. Whinery was driving around a long right curve on Pederson Road when his vehicle twice struck the median, which was raised and landscaped. He overcorrected his steering, skidded, and then struck the median again, continuing through it until the side of his car collided with a tree and stopped.  (AR 42-47, 70).

17.     Police estimated Mr. Whinery's vehicle's speed at approximately 89-95 miles per hour.  (AR 46).  Although LINA never relied on this fact in making any of its determinations, the police report also states that Mr. Whinery was not wearing his seat belt at the time of the collision.  (AR 43-44).

18.     Mr. Whinery was declared dead at the scene by the Ventura County Fire Department. (AR 70).

19.     There was no evidence of alcohol at the scene (AR 70), but Mr. Whinery's blood alcohol content ("BAC") was measured at .22%, nearly three times the legal limit.  (AR 59). Cannabinoids were also detected in Mr. Whinery's blood.  (AR 57).

20.     The Ventura County Medical Examiner concluded in its Death Investigation Report that the "Cause of Death" was "Multiple blunt force injuries," and the "Manner of Death" was "Accident."  (AR 70-71).

21.     The County of Ventura subsequently issued a death certificate which confirmed that the "immediate cause" of death was "multiple blunt force injuries."  (AR 86).

22.     The certificate did not list any "underlying causes" or "other significant conditions contributing to death."  (AR 86).

23.     The incident was reported by the Thousand Oaks Acorn.  (AR 78-79).  The article in the Thousand Oaks Acorn reported that Karen Biehl and Glenn Blatt had observed Mr. Whinery's erratic driving approximately 15 minutes before the impact.  (AR 78).  According to Ms. Biehl, she and Mr. Blatt were walking in the area at about 10:30 p.m. when they "saw

-5-

the silver BMW racing up and down Pederson at about 100 miles an hour.  After it went racing past us about six or eight times I said, 'He's going to crash.'"  (AR 78).  Later than evening, after seeing that the car had crashed into the tree, Mr. Blatt called Ms. Biehl and told her that she had been right.  (AR 78).  According to Biehl, Mr. Whinery "was just driving around and around on Pederson going really fast from Erbes Road to Radcliff."  (AR 78).

24.     On January 2, 2008, Plaintiff submitted a claim for benefits under the Policy.  (AR 82-83).

25.     After obtaining reports from the Ventura County Sheriff and the Medical Examiner, LINA denied Plaintiff's claim in a February 22, 2008 letter by Accident Claim Specialist Barry Fraser.  (AR 23-25).

26.     In his letter, Mr. Fraser stated:

> Payment of Accidental Death benefits are subject to various provisions described under the Accidental Death and Dismemberment plan with Citigroup, N.A.  The provisions specific to your claim are quoted below:
>
> We agree to pay benefits for loss from bodily injuries caused by an accident which happens while an insured is covered by this policy and which, directly and from no other causes, result in a covered loss.
>
> For the purposes of this policy an accident is a sudden, unforeseeable, external event.  (AR 23).

27.     The language "For the purposes of this policy an accident is a sudden, unforeseeable, external event" does not occur in the Policy.

28.     Mr. Fraser's letter continued:

> Injury or death that is foreseeable is not covered by the provisions of Policy OK 815669.  There is no evidence to support that Mr. Whinery would not have been aware of the

> dangers directly associated with operating a vehicle while legally
> intoxicated.  As the crash that killed Mr. Whinery was not an
> unforeseeable event, given his state of intoxication, it is our
> determination that Mr. Whinery's death was not due to an
> accident.  (AR 24).

29.   Plaintiff appealed this determination in an April 14, 2008 letter.  (AR 17-20).

30.   In her appeal, Plaintiff stated that she had reviewed the Policy "a number of times however, I have been unable to locate the passage he appears to have relied upon in denying the claim.  It would be most helpful if I could be directed to the page in the policy where this passage is located."  (AR 19).

31.   Plaintiff also stated:

> [E]ven if this language is in the policy . . . I disagree with the
> determination that it is per say [sic] foreseeable that someone
> would die while driving with a blood alcohol level which
> exceeds the legal limit.  In fact, it is foreseeable that anyone
> operating a vehicle, or even riding as a passenger, could perish
> in an accident.  The same goes for anyone who rides a
> commercial air flight or crosses the street as a pedestrian.  The
> point is that the vast majority of the people who drive with
> alcohol in their system do not die.  (AR 20).

32.   In response, LINA referred the file to a toxicologist, Dr. Frederick W. Fochtman. LINA asked Dr. Fochtman to "provide an opinion regarding to what extent, if any, did Mr. Whinery's intoxication cause or contribute to his death."  (AR 14).

33.   Dr. Fochtman responded in a May 26, 2008 report in which he concluded: "It is my opinion that the concentration of alcohol in Mr. Whinery's blood would have rendered him impaired to the extent that it contributed to the cause of his crash and resultant death."  (AR 8-9).

34.     Four days later, LINA denied Plaintiff's appeal in a letter by Technical Specialist

Renee Worst.  (AR 3-6).

35.     In her letter, Ms. Worst did not respond to Plaintiff's inquiry regarding her inability

to find the quoted policy language in LINA's prior letter.

36.     Instead, Ms. Worst's letter stated:

>           The Citigroup, N.A. Accidental Death policy OK 815669 states:
>
>           We agree to pay benefits for loss from bodily injuries caused by
>
>           an accident which happens while an insured is covered by this
>
>           policy and which, directly and from no other causes, result in a
>
>           covered loss.
>
>           For the purpose of this policy an accident is a sudden,
>
>           unforeseeable, external event.  (AR 3).

37.     Ms. Worst's letter further stated:

>           Injury or death resulting from driving under the influence of
>
>           alcohol is considered foreseeable in California and is not
>
>           covered by the provisions of policy OK 815669.  Driving when
>
>           heavily intoxicated precludes a finding that a death is
>
>           Accidental.  As mentioned previously, the policy definition of a
>
>           Covered Accident requires that a loss not be foreseeable.  Based
>
>           on this, we've determined that no Accidental Death benefits are
>
>           payable at this time.  (AR 4).

38.     Ms. Worst's letter also raised an additional reason to deny Plaintiff's claim that was

not presented in LINA's first denial:

>           The provisions of policy OK 815669 do not cover a loss that is
>
>           the result of an intentional, self-inflicted injury.  The available
>
>           evidence indicates that Mr. Whinery's death resulted directly
>
>           from intentionally operating a vehicle while under the influence
>
>           of alcohol.  (AR 5).

39.     LINA maintains several documents which instruct its claim handlers how to evaluate accident claims that involve an intoxicated insured.

39.     During the Court-sanctioned discovery concerning LINA's potential conflict of interest, Plaintiff's counsel deposed Brian Billeter, LINA's Regional Claims Manager.  (AR 131-311).  During that deposition, Plaintiff's counsel questioned Mr. Billeter about several documents prepared by LINA that Plaintiff's counsel had obtained in an unrelated lawsuit, including a February 23, 1993 SRO communications memorandum, and an "AD&D Instructor's Guide."  Those documents include guidelines for analyzing claims for accidental death benefits involving intoxicated drivers that would be more favorable to Plaintiff than the standards LINA actually used to deny Plaintiff's claim.  According to Mr. Billeter, however, those documents were outdated and did not reflect LINA's claims-handling policies at the time LINA processed Plaintiff's claim.  (AR 183-207).

40.     Mr. Billeter, who was designated by LINA as its person most knowledgeable regarding LINA's policies and procedures, testified that LINA handles claims that arise under policies in which LINA has been granted discretion differently from claims that arise under policies in which LINA does not have such authority.  If the policy grants LINA discretionary authority, LINA claims handlers decide for themselves how to interpret the policy at issue.  If they do not have discretion, LINA claims handlers confer with in-house counsel regarding how to interpret the policy.  (AR 227-30).

41.     Mr. Billeter testified that being granted discretionary authority "allows us to reasonably define policy terms, so that it makes for what potentially could be a different policy definition than would otherwise be the policy definition."  (AR 228).

42.     Mr. Billeter further testified that in cases where LINA believes it has discretionary authority to interpret the terms of a policy, it does not need to consider Ninth Circuit law regarding the definition of "accident" in adjudicating claims. (AR 232).

43.     Mr. Billeter was also asked if he had ever paid a claim like Ms. Whinery's, i.e., an accidental death claim where (1) the policy was governed by ERISA, (2) the policy did not have a definition of "accident," (3) there was no intoxication exclusion, (4) there was a grant

of discretionary authority, and (5) the death was a result of intoxicated driving.  Mr. Billeter, who has worked for LINA for 14 years, the last nine of which were in the AD&D unit (AR 145), responded that he could not recall a single occasion in which he had approved such a claim.  (AR 245-48).

44.     Ms. Worst, who upheld the denial of Plaintiff's claim, testified that she could only think of one occasion in which she had approved a claim where the insured died while driving with a BAC over the legal limit, but the circumstances were different because road construction was a contributing factor to the death.  (AR 475-76).

45.     When asked to define "foreseeability" for the purpose of the Policy, Mr. Billeter and Ms. Worst gave different answers.  Mr. Billeter testified that in evaluating foreseeability, he uses the test of whether the insured was "taking on a significant assumption of an undue risk."  (AR 235-36).  Ms. Worst testified that in evaluating foreseeability, she determines whether death is "likely to happen."  (AR 495-96).

46.     At the first trial on December 20, 2011, the Court determined that the matter should be remanded to LINA so that it could have an opportunity to analyze Plaintiff's claim pursuant to the definition of "accident" adopted by the Ninth Circuit in <u>Padfield v. AIG Life Ins. Co.</u>, 290 F.3d 1121 (9th Cir. 2002).

47.     On remand, LINA rendered its decision in a letter dated February 3, 2012.  (AR 118-22).  Writing on behalf of LINA, Mr. Billeter maintained that it "exercises the discretionary authority . . . to define the term accident, which is otherwise undefined, as a 'sudden, unforeseeable, external event.'"

48.     LINA admitted that Mr. Whinery's death was both sudden and external.  (AR 119-20).

49.     As for "foreseeability," LINA admitted that it had been instructed by the Court to apply the test set forth in <u>Padfield</u>, which contains both a subjective and an objective inquiry.  (AR 120).

50.     Under the subjective inquiry, LINA stated that it "cannot ascertain the subjective expectations of the insured."  (AR 120).

-10-

51.     Under the objective inquiry, LINA stated that it would "determine this aspect of the analysis on the basis of a reasonable person's perception, and not on the basis of any statistical probability."  (AR 120).

52.     LINA concluded that "'substantially certain to result' does not require inevitability, or certainty, per se, but instead entails a level of inevitability that is of a significant or large degree."  (AR 120-21).

53.     After recounting some of the specific facts concerning the collision, including Mr. Whinery's personal characteristics, his high rate of speed, his driving up and down the same stretch of road six to eight times, and a blood alcohol level nearly three times the legal limit, LINA concluded that "Mr. Whinery's death is not accidental in nature based upon an analysis of the claim utilizing the Padfield standard of review."  (AR 121).

54.     LINA also stated that it had "discretionary authority" and thus was "vested to interpret the terms of the plan and make findings of fact."  Under this authority, and "[c]onsistent with the federal common law of ERISA, LINA, in its discretion, applies the following test of unforeseeability: whether the voluntary conduct of the insured constitutes the significant assumption of an undue risk."  (AR 121).

55.     Based upon this second analysis, LINA concluded that Mr. Whinery's actions "constitute[d] significant assumption of an undue risk" and thus his death was "not accidental in nature based upon an analysis of the claim utilizing LINA's test of unforeseeability, based upon LINA's discretionary authority as provided in the policy."  (AR 122).

56.     Plaintiff appealed LINA's decision through counsel in an April 27, 2012 letter.  (AR 123-30).  Plaintiff's appeal was accompanied by supporting documentation, including the depositions of Mr. Billeter and Ms. Worst.  (AR 131-1064).  Plaintiff's counsel later supplemented Plaintiff's appeal by forwarding to LINA copies of the decisions in McClelland v. Linfe Ins. Co. of N. Am., 679 F.3d 755 (8th Cir. 2012) and Firman v. Life Ins. Co. of N. Am., 684 F.3d 533 (5th Cir. 2012).  (AR 1065-91).  Both of those cases were decided after LINA's initial denial following the remand, and concluded that LINA abused

its discretion by denying accidental death benefits where the insureds died in vehicle crashes where they had blood alcohol levels of .20%

57.     LINA denied Plaintiff's appeal in a June 28, 2012 letter.  (AR 1092-1100).

58.     Having exhausted her administrative remedies pursuant to the Court's remand order, plaintiff's action against defendants returned to the Court's active calendar.

## II.     **Jurisdiction and Venue**

This action involves a claim for long term disability benefits under an employee welfare benefit plan regulated by ERISA.  As such, the Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  See, e.g., Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987); Parrino v. FHP, Inc., 146 F.3d 699, 703-04 (9th Cir. 1998).  Venue in the United States District Court for the Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2).  The parties do not dispute the facts requisite to federal jurisdiction and venue.

## III.     **Standard of Review**

A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989); Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 866 (9th Cir. 2008).  Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the plan for an abuse of discretion.  Firestone, 489 U.S. at 115, 109 S. Ct. at 957.  However, in order for the abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the administrator or fiduciary.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir. 1999).

In this case, the Policy confers discretionary authority on LINA.  Specifically, the Policy states that LINA "shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the

1  Plan, and to make any related findings of fact.  All decisions made by [LINA] in this

2  capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full

3  extent permitted by law."  (AR 94.)  The Court concludes that the foregoing language

4  unambiguously grants discretion to LINA.

5          Once the Court concludes that the policy vests discretionary authority in the

6  administrator or fiduciary, the Court must determine whether the administrator or fiduciary

7  is operating under a conflict of interest.  In recent decisions, first the Ninth Circuit, and then

8  the Supreme Court, determined that the abuse of discretion standard still applies even when

9  the administrator has a conflict of interest.  See Metro. Life Ins. Co. v. Glenn, 128 S. Ct.

10 2343, 2346, 171 L. Ed. 2d 299 (2008) ("Often the entity that administers the plan, such as an

11 employer or an insurance company, both determines whether an employee is eligible for

12 benefits and pays benefits out of its own pocket.  We here decide that this dual role creates a

13 conflict of interest; that a reviewing court should consider that conflict as a factor in

14 determining whether the plan administrator has abused its discretion in denying benefits; and

15 that the significance of the factor will depend upon the circumstances of the particular

16 case."); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (2006) ("Abuse of

17 discretion review applies to a discretion-granting plan even if the administrator has a conflict

18 of interest.  But Firestone also makes clear that the existence of a conflict of interest is

19 relevant to how a court conducts abuse of discretion review.").

20         Where, as here, an insurer "acts as both the plan administrator and the funding source

21 for benefits," the insurer "operates under what may be termed a structural conflict of

22 interest."  Abatie, 458 F.3d at 965.  In the case of such a structural conflict of interest, the

23 Court is to apply an abuse of discretion review which is "tempered by skepticism

24 commensurate with the plan administrator's conflict of interest."  Id. at 968.  As the

25 Supreme Court explained:

26                  We believe that Firestone means what the word 'factor' implies,

27                  namely, that when judges review the lawfulness of benefit

28                  denials, they will often take account of several different

-13-

considerations of which a conflict of interest is one. . . . In such

instances, any one factor will act as a tiebreaker when the other

factors are closely balanced, the degree of closeness necessary

depending upon the tiebreaking factor's inherent or case-specific

importance.

Glenn, 128 S. Ct. at 2351; see also Abatie, 458 F.3d at 968 ("A district court, when faced

with all the facts and circumstances, must decide in each case how much or how little to

credit the plan administrator's reason for denying insurance coverage.  An egregious conflict

may weigh more heavily (that is, may cause the court to find an abuse of discretion more

readily) than a minor, technical conflict might."); id. at 968-69 ("The level of skepticism

with which a court views a conflicted administrator's decision may be low if a structural

conflict of interest is unaccompanied, for example, by any evidence of malice, of

self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict

more heavily if, for example, the administrator provides inconsistent reasons for denial; fails

adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a

claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by

interpreting plan terms incorrectly or by making decisions against the weight of evidence in

the record.") (internal citations omitted).

"What the district court is doing in an ERISA benefits denial case is making

something akin to a credibility determination about the insurance company's or plan

administrator's reason for denying coverage under a particular plan and a particular set of

medical and other records."  Abatie, 458 F. 3d at 969.  In other words, "[a] district court,

when faced with all the facts and circumstances, must decide in each case how much or how

little to credit the plan administrator's reason for denying insurance coverage."  Id. at 968;

Saffon, 522 F.3d at 868-69.  "The district court may, in its discretion, consider evidence

outside the administrative record to decide the nature, extent, and effect on the

decision-making process of any conflict of interest; the decision on the merits, though, must

1   rest on the administrative record once the conflict (if any) has been established, by extrinsic

2   evidence or otherwise."  Abatie, 458 F.3d at 970.

3       Even when a plan administrator incorrectly interprets a plan provision, the

4   administrator's subsequent decision following remand does not lose the deference to which

5   it would otherwise be entitled simply because the administrator erred during its first

6   evaluation.  "[T]he interests of efficiency, predictability, and uniformity — and the manner

7   in which they are promoted by deference to reasonable plan construction by administrators

8   — do not suddenly disappear simply because a plan administrator has made a single honest

9   mistake."  Conkright v. Frommert, 176 S. Ct. 1640, 1649 (2010); see also id. at 1647 ("If, as

10  we held in Glenn, a systemic conflict of interest does not strip a plan administrator of

11  deference, it is difficult to see why a single honest mistake would require a difference

12  result.").

13  **IV.   <u>Analysis</u>**

14      LINA is both the plan administrator and financially responsible for any benefits paid

15  under the policy.  As such, LINA operates under a structural conflict of interest.  Abatie, 458

16  F.3d at 965.  The Administrative Record also contains evidence that when a subject policy

17  does not include a definition of "accident," LINA applies a different definition of "accident"

18  when a policy grants it discretion than when it does not possess discretion.  In this way,

19  LINA appears to abuse its discretion by taking inconsistent positions and adopting positions

20  that favor it over the beneficiaries of the plans it administers.

21      The Administrative Record also discloses that at least when it has discretion, LINA

22  believes that it is not obligated to apply Ninth Circuit law to construe terms that are not

23  defined by the subject policy.  Contrary to LINA's assertion that Padfield only applies when

24  LINA does not benefit from ERISA's grant of discretion, the Court concludes that Padfield

25  applies whenever an accidental death policy does not define "accident."  Nothing in Padfield

26  limits its holding to cases in which the administrator lacks discretion.  Instead, with Padfield,

27  the Ninth Circuit has adopted "an overlapping subjective and objective inquiry" to determine

28  "whether death, or the injury that caused death, was unexpected or intentional" whenever an

1  accidental death policy does not supply a definition of accident.  Padfield, 290 F. 3d at 1126.

2  In applying this inquiry:

3             The court first asks whether the insured subjectively lacked an

4             expectation of death or injury.  If so, the court asks whether the

5             suppositions that underlay the insured's expectation were

6             reasonable, from the perspective of the insured, allowing the

7             insured a great deal of latitude and taking into account the

8             insured's personal characteristics and experiences.  If the

9             subjective expectation of the insured cannot be ascertained, the

10            court asks whether a reasonable person, with background and

11            characteristics similar to the insured, would have viewed the

12            resulting injury or death as substantially certain to result from

13            the insured's conduct.

14  Id. (citations omitted) (citing Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1088

15  (1st Cir. 1990).  By failing to apply Padfield in the first instance, LINA abused its discretion.

16       On remand, LINA did apply the Padfield definition of "accident" to Plaintiff's claim,

17  but also persisted in evaluating the claim under its own definition focusing on "whether the

18  voluntary conduct of the insured constitutes the significant assumption of an undue risk."

19  The Court understands that LINA wishes to maintain an appellate argument that it has

20  discretion to adopt a definition of accident that differs from that adopted by most if not all of

21  the Courts of Appeal to have considered the issue, but that insistence calls into question the

22  degree to which LINA's conflict of interest has influenced its exercise of discretion.

23       Overall, the Court concludes that LINA's apparent conflict of interest and claims

24  handling suggest that LINA has abused its discretion in a number of ways.  This abuse of

25  discretion was not cured simply by LINA's consideration of Padfield on remand.  Indeed,

26  there is evidence that LINA has not "made a single honest mistake," but instead has a

27  practice of utilizing incorrect policy definitions to deny claims involving intoxicated drivers.

28  Conkright, 176 S. Ct. at 1649.  The Court therefore concludes that although it must still

-16-

1   accord LINA's decision with deference, that deference is exceedingly minimal.  The Court

2   has therefore employed the highest level of skepticism in assessing LINA's decision to deny

3   Plaintiff's claim.[2/]

4          Even under this heightened level of skepticism, and affording LINA's decision only

5   minimal deference, the Court cannot conclude that LINA abused its discretion when it

6   denied Plaintiff's claim once it analyzed that claim with <u>Padfield's</u> definition of "accident."

7   Specifically, given the facts available to it, LINA did not abuse its discretion when it

8   determined that it could not ascertain Mr. Whinery's subjective expectations.  <u>Padfield</u>, 290

9   F. 3d at 1126.

10         The Court also cannot conclude that LINA abused its discretion when it concluded

11   that "a reasonable person, with background and characteristics similar to the insured, would

12   have viewed the resulting injury or death as substantially certain to result from the insured's

13   conduct."  <u>Id.</u>  Indeed, as the Administrative Record discloses, Mr. Whinery had a blood

14   alcohol content of .22%, nearly three times the legal limit, had cannabinoids in his system,

15   and was on a number of prescription medications at the time of the collision.  Mr. Whinery

16   was speeding around and around in circles on a city street at between 89 and 95 miles per

17   hour at 10:45 p.m. in an area with a posted speed limit of 45 miles per hour.  While LINA

18   never relied on it in its decisions, the Court also finds it particularly compelling that Mr.

19   Whinery was not wearing a seat belt while engaged in this exceedingly reckless behavior.

20

21   [2/]     There is also an indication in the documents submitted for the Court's in camera

22   review that LINA's outside counsel had formulated a view concerning the outcome of
LINA's <u>Padfield</u> analysis on the day the Court issued its remand order.  (PRIV 175-76).  The

23   Court does not view this as particularly relevant to the manner in which LINA exercised its
discretion on remand.  By the time of the Court's remand order, the matter had been fully

24   briefed for the first trial and the parties had considered and argued both the applicability of

25   <u>Padfield</u> and what they believed the outcome should be if the claim were analyzed using
<u>Padfield's</u> definition of accident.  More generally, after reviewing all of the documents

26   submitted in camera, the Court does not believe that they provide evidence relevant to the
level of deference to which LINA's decision is entitled that is not otherwise provided in the

27   Administrative Record.  Put simply, because the Court has adopted the highest level of
skepticism, the documents submitted in camera cannot increase the Court's level of review

28   any further.

As one person who saw Mr. Whinery driving before the crash remarked, "He's going to crash." A reasonable person could very well conclude that death would be substantially certain to result from such activity, and LINA did not abuse the minimal level of discretion to which it is entitled in reaching that conclusion.

LINA also did not abuse its discretion when it rejected any reliance on the statistical evidence presented by Plaintiff. Those statistics, dealing generally with the statistical probability of death as a result of driving under the influence of alcohol, do not differentiate between levels of intoxication, and provide no evidence of the likelihood of survival for a person with a .22% blood alcohol content driving 89 to 95 miles an hour at night on city streets without a seat belt. See Stamp v. Met. Life Ins. Co., 531 F.3d 84, 92 (1st Cir. 2008) ("[The risk of being involved in a fatal crash rises as blood alcohol levels rise. Accordingly, statistics that do not differentiate between various levels of intoxication are inapposite.") (affirming administrator's denial of life insurance benefits where the insured died in a car crash while driving with a blood alcohol level of .265%).

For all of the foregoing reasons, and reviewing the Administrative Record in light of the minimal deference to which LINA's decision is entitled, the Court concludes that LINA did not abuse its discretion when it denied Plaintiff's claim for accidental death benefits.

**Conclusion**

For all of the foregoing reasons, the Court finds that LINA did not abuse its discretion when it denied Plaintiff's claim for accidental death benefits. Accordingly, the Court will enter judgment in favor of LINA and the Plan.

IT IS SO ORDERED.

DATED: November 7, 2012

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE

-18-